UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Nick D. Sweeney            )
                           )
        Plaintiff,         )
                           )
        v.                 )
                           )      C.A. No. 19-cv-30069-MAP
Andrew M. Saul,            )
Commissioner of Social     )
Security,                  )
        Defendant.         )
                           )
                           )
                           )

MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTIONS FOR
ORDER REVERSING the COMMISSIONER'S DECISION AND DEFENDANT'S
MOTION TO AFFIRM THE COMMISSIONER'S DECISION
(Dkt. Nos. 17, 20, and 24)

March 29, 2021

PONSOR, U.S.D.J.

I.   INTRODUCTION

Plaintiff has filed two, essentially duplicate, motions
seeking reversal of the final decision by the Commissioner
of Social Security ("Defendant") denying his application
for Social Security Disability ("SSDI") and Supplemental
Security Income ("SSI") benefits. (Dkt. Nos. 17 and 20.)
Defendant has filed a responsive motion seeking affirmance

1

of the decision. Dkt. No. 24.  For the reasons set for
below, the court will deny Plaintiff's motions, allow
Defendant's motion, and order entry of judgment for
Defendant.

Although Plaintiff's memorandum notes that Plaintiff
suffers from various severe physical impairments, it offers
no argument that these would prevent him from performing
work at the sedentary level, with the limitations specified
by the Administrative Law Judge ("ALJ").  As Defendant's
memorandum notes, this appeal focuses entirely on
Plaintiff's alleged mental impairments. (Def. Mem., Dkt.
25, 4 n. 3.) With regard to these, it is true that the
record includes references to disturbing and bizarre
behavior by Plaintiff, as well as a very unusual manner of
living. It is also true, however, that the record offers
other substantial evidence that Plaintiff does not suffer
mental impairments sufficient to render him disabled under
the applicable standard. It is Defendant's responsibility
to weigh the conflicting medical evidence to determine
disability, and this court must affirm Defendant's
decision, so long as there is substantial evidence
supporting it. Given this standard, the court is obliged

(albeit with misgivings) to accept Defendant's assessment
of disability and order entry of judgment accordingly.

## II.  PROCEDURAL BACKGROUND

Plaintiff is a high school graduate who was forty-three
years old at the time of his last employment. He has worked
in the past as an appliance repairman, delivery truck
driver, and construction worker. (SSA Admin. Rec., Dkt. 14
("Tr."), 147-48.)  He has identified, and Defendant has
accepted, June 3, 2013 as the date he last worked and as
the date of the alleged onset of his disability. (Tr. 30,
103.) Plaintiff applied for SSDI and SSI benefits on
September 22, 2016. (Tr. 341, 343.) After an initial
denial, Plaintiff appeared for a hearing before the ALJ on
September 11, 2017. On January 16, 2018, the ALJ issued his
opinion finding Plaintiff not disabled. On review, the
Appeals Counsel remanded the case, finding that "[f]urther
consideration of the claimant's mental residual functional
capacity is needed." (Tr. 203-04.) On September 11, 2018,
Plaintiff appeared for a second hearing before the ALJ.
(Tr. 54-90.) On October 12, 2018, the ALJ issued his
decision on remand, again finding Plaintiff not disabled.

3

(Tr. 27-46.) Plaintiff's request for review by the Appeals
Counsel was denied on March 18, 2019. (Tr. 1-6.) The ALJ's
October 12, 2018 memorandum thus constitutes the final
decision of the Commissioner, subject to judicial review
under 42 U.S.C. § 405(g).

In his October 12, 2018 memorandum ("ALJ memo") the ALJ
followed the classic sequential analysis to determine
disability. He found that Plaintiff met the insured status
requirements through at least September 30, 2016 and that
he had not engaged in any substantial gainful activity
since June 4, 2013. (Tr. 30.) He found that Plaintiff
suffered certain severe impairments, specifically:
degenerative disc disease of the cervical and lumbar spine;
osteoarthritis in both knees following a meniscus tear;
left shoulder impingement syndrome; asthma; hypertension;
obesity; right foot osteophyte with degenerative changes to
the joint; depressive disorder, and personality disorder.
(*Id.*)

Continuing his analysis, the ALJ found that none of
these impairments, and no combination of them, equaled the
level of severity of any of the impairments listed in the
regulations. (Tr. 38.) As a result, Plaintiff was not

**4**

entitled to an immediate finding of disability without
further analysis.

Moving to the final stage, the ALJ examined the medical
record and concluded that, despite his severe impairments,
Plaintiff had the residual functional capacity to perform
sedentary work, provided that he could alternate between
sitting and standing every 15-20 minutes, that no more than
occasional climbing would be required, and that no kneeling
or crawling, use of foot pedals or ladders, exposure to
heights, or hazards such a dangerous machinery would be
needed. (Tr. 40.) Other limitations included: no repetitive
overhead work with the left arm; no concentrated exposure
to fumes, dust, smoke, chemicals, or gases; and no exposure
to vibrations. (*Id.*) Significantly, the ALJ also limited
Plaintiff's work to simple, routine, repetitive tasks,
which would require concentration for no more than two-hour
time periods, no interaction with the general public, and
no more than occasional, superficial interaction with
coworkers. (*Id.*)

Based on the testimony of a vocational expert, the ALJ
concluded that, even with these limitations, and accepting
that Plaintiff was unable to do any of his past jobs,

Plaintiff retained the capacity to make "a successful adjustment to other work that exists in significant numbers in the national economy." (Tr. 45.) The ALJ therefore found Plaintiff "not disabled" as defined by the Social Security Act. (*Id.*)

### III. <u>MEDICAL HISTORY</u>

The great majority of the medical records in this case document frequent visits to various providers to obtain treatment for physical problems. As noted above, this appeal challenges only the ALJ's conclusions regarding Plaintiff's alleged mental impairments.

It should be noted at the outset, that Plaintiff's argument on this point confronts two somewhat unusual hurdles: first, Plaintiff himself does not appear to acknowledge, to any consistent or substantial degree, that he suffers mental or emotional impairments; second, although he has a long history of consulting medical professionals for his physical problems and appears to have a good relationship with his primary care physician, Plaintiff has never received or actively sought any mental health treatment. He has never been hospitalized for any emergency mental health issue. These difficulties are not,

of course, fatal to Plaintiff's appeal in themselves. As Defendant acknowledges, an inability to recognize a need for mental health treatment may itself sometimes be a symptom of an underlying mental impairment or disability. *White v. Comm'r of Soc. Sec.,* 572 F.3d 272, 284 (6th Cir. 2009). Moreover, the absence of any mental health treatment history may be explained, in part at least, by Plaintiff's very unusual manner of living. These factors do, however, tend to undermine Plaintiff's claim of mental disability, especially when viewed in light of the record as a whole.

It is also significant that medical records over many years documenting treatment for Plaintiff's physical problems repeatedly rule out any serious mental disability. For example, the record of a visit to Dr. Kevin Mitts on November 30, 2013, a few months after Plaintiff's alleged onset of disability, states that Plaintiff "appears alert and oriented . . . has appropriate affect and demeanor . . . [and] appears to have good insight and judgment." (Tr. 772.)  Numerous descriptions to this effect appear in the reports of his appointments with his doctors and in emergency room and pain clinic records. (*See*, *e.g.,* Tr. 736 (1/30/2015 visit to Berkshire Health System, Pain,

Diagnosis & Treatment Center, describing Plaintiff with "normal" orientation, mood and affect); Tr. 1135 (5/19/2016 visit to Dr. Anping Han, describing Plaintiff as having insight and good judgment with "normal mood and affect" and being "active and alert"); Tr. 1487 (6/12/16 visit to Berkshire Medical Center, Emergency Department, describing Plaintiff as "alert awake" with "clear fluent speech" and "normal affect").) Defendant's memorandum notes literally dozens of such references in the medical record, which are not contested by Plaintiff. (Def. Mem., Dkt. 25, 4-5.)

The office notes of Plaintiff's primary care physician, Dr. Daniel Patel, offer a particularly helpful profile of Plaintiff's condition. Dr. Patel met with Plaintiff for the first time on July 6, 2016 when he sought treatment for various physical ailments. The office note indicated that Plaintiff did not have a psychiatric diagnosis and that he denied hearing voices or having manic episodes. (Tr. 834.) Dr. Patel's report noted that Plaintiff "insists that he lives out in the woods, that he traps animals for food, and he has some small gardens from which he gets vegetables. He says he washes outdoors and washes his clothes in streams, even in the winter." (Tr. 835.) Dr. Patel expressed some

8

skepticism about this claim at the conclusion of the
report, stating that "[t]his gentleman looks much too clean
and his clothes are in much too good shape for someone who
has really been living in the woods and washing in streams
for 3 ½ years. I feel I don't have a good handle on this."
(Tr. 836.) At Dr. Patel's suggestion, Plaintiff expressed a
willingness to talk to a psychiatrist, but the record does
not indicate that any such consultation ever occurred.
Approximately a month later, Dr. Patel saw Plaintiff again,
noting once more that he lived in the woods "in a range of
hills somewhere around Pittsfield and Hancock. He says he
has been living there for three years in a camping hammock,
he moves whenever somebody discovers his campsite. He does,
however, have a cell phone and says he can be reached . . .
." (Tr. 831.) The note concludes with the observation that
"[t]his gentleman has a very unusual style and affect. His
story, however, has been consistent every time I've seen
him." (Tr. 832.) A possible psychiatric consultation is
again mentioned, but again without any record of follow-up.
One month later, on September 6, 2016, Plaintiff met again
with Dr. Patel, at which time he reported that he was
"going to move to his winter quarters." (Tr. 828.) He was

described at that time as "a well-developed, fit-appearing 46-year-old gentleman with a slightly unusual affect." (Tr. 829.) Dr. Patel noted that "it sounds like as the leaves come off the trees, he is concerned about being spotted and he doesn't want to leave his isolation.") (*Id.*) This report indicated that Plaintiff stated that he was "not closed to the idea of psychiatric investigation" but did not want to move forward with it at that time "because he was sure he wouldn't be available for meetings." (*Id.*) Two visits with Dr. Patel in February and December 2017 again noted Plaintiff's unusual living situation but without any specific suggestion that Plaintiff suffered from any serious mental or emotional disorder. The notes by this time included no discussion of possible psychiatric treatment.

On March 8, 2018 Plaintiff saw orthopedist Kevin Mitts, M.D. for right hip pain. The note of the consultation was rather odd. It reported that Plaintiff told the doctor that he fell and dislocated his hip but "was found on the ground by a group of balerina's [sic] walking the trail . . . [who] were able to relocated [sic] his hip." (Tr. 1793.) Significantly, no questions were put to Plaintiff regarding

this reference in Dr. Mitts's note at either hearing.
Elsewhere in the same report, Plaintiff was described as
"well developed, well groomed, and [in] no apparent
distress," having "appropriate affect and demeanor [and] .
. . good insight and judgment." (*Id.*)  He was referred for
an MRI. On April 2, 2018, he returned to Dr. Mitts, but
this time was "poorly groomed, dirty/unwashed but not
odorous, and anxious." (Tr. 1796.) Plaintiff had an
outburst when Dr. Mitts asked about his MRI, and Plaintiff
apparently thought the doctor was minimizing his pain and
impairment. He was ultimately asked to leave, and did
leave, the doctor's office. (Tr. 1797.)

Only two reports by mental health specialists appear in
the record: a report of an examination by Teena Guenther,
Ph.D., conducted on December 14, 2016 in connection with
Plaintiff's application for MassHealth and state disability
benefits (Tr. 1679-86) and a consultative report by Brett
Hartman, Psy.D., dated November 27, 2017, in connection
with Plaintiff's application for Social Security benefits
(Tr. 1625-28).

Dr. Guenther emphasized that Plaintiff was respectful
and polite but had an "odd" presentation. (Tr. 1679.) The

consultation was rendered difficult, because certain questions seemed to trigger underlying anger on Plaintiff's part, which made Dr. Guenther "cautious about asking certain questions or getting more detail." (*Id.*) Plaintiff was dressed inappropriately in a pair of shorts and a short-sleeved T-shirt on an extremely cold day. He had a tight Velcro strap around his knee to assist with pain. He reported, as he had with other clinicians, that he lived alone in the woods and that he moved further into them during the winter to avoid being seen.  He reported that at some point his camp was robbed. He denied any history of psychiatric treatment and stated that he could handle symptoms such as depression by himself.  Dr. Guenther found her ability to get details about Plaintiff's functional level was "a bit limited" due to Plaintiff's preoccupation with his physical difficulties. (Te. 1681.) When she asked about prior trauma, Plaintiff mentioned that he had been "captured and tortured" in Israel, but he became "quite defensive" when she tried to follow up with questions about this. (*Id.*) Similarly, a question about Plaintiff possibly being depressed provoked a defensive response. Plaintiff stated that he was "not particularly comfortable around

others." (Tr. 1682.) Plaintiff did not suffer hallucinations or delusions, but in Dr. Guenther's opinion he did give indications of suspicious or perhaps even paranoid thoughts about others. He admitted having trouble focusing or concentrating perhaps due to his distress about his limited resources, and at one point he said "I think sometimes I'm losing my f-ing mind." (*Id.*) Due to her concerns about possibly triggering Plaintiff's anger with probing questions, Dr. Guenther was unable to complete any formal mental status exam. Plaintiff did state that he had friends he saw in the summer and sometimes spent time with family. (Tr. 1684.)

In her summary, Dr. Guenther found Plaintiff's interactive style "a bit odd or atypical," and she suspected that this might reflect an underlying personality disorder. She believed that Plaintiff's inability to interact with others was "a major hindrance in employment." (*Id.*) She suspected that a potential employer who might interview Plaintiff, or a coworker alongside him, would notice some "behavioral extremes and the atypical personality style, which may even result in some distractions to those who work with him." (*Id.*) She stated

that "[he] does appear capable of following and understanding a variety of directions and instructions, but there may be some underlying cognitive interference that could impact persistence on tasks." (*Id.*) Possibly due to Dr. Guenther's concerns about pressing her questions to Plaintiff, her diagnostic impressions were provisional: personality disorder with schizotypal and paranoid features; adjustment disorder with anxious and depressed mood. Her prognosis was guarded. (Tr. 1685.)

Dr. Hartman's report, approximately a year later in November of 2017, noted Plaintiff's chronic physical problems and the fact that he did "feel depressed because he misses 'my old life'" and experienced "sadness, agitation, low energy, reduced self-esteem, and frequent irritability." (Tr. 1626.) Plaintiff reported concentration difficulties and short-term memory deficits. He was cooperative yet "quite agitated" and "appeared to be in considerable pain." (*Id.*)  His dress was casual, but he was "fairly" well groomed, his speech was clear and fluent, and his thought processes coherent and goal directed. (*Id.*) His affect was anxious, possibly due to pain. He was alert and oriented. While his attention and concentration appeared to

14

be mildly impaired, his recent and remote memory skills "appeared to be generally intact" and his intellectual functioning "appeared to be in the average range." (Tr. 1627.) His insight was fair to poor, and his judgment was fair. Compared to many applicants for benefits, Plaintiff's competencies were rather advanced. He could dress, bathe and groom himself; do his own cooking, cleaning, and laundry; shop for himself, manage his money, and drive; understand, remember, and apply simple directions; understand, remember, and apply complex directions; use reason and judgment; sustain an ordinary routine; maintain personal hygiene; detect hazards and take necessary precautions. (Tr. 1627-28.) His difficulty regulating his emotions and behavior was mild; his difficulty interacting with others was mild to moderate; and his difficulty sustaining concentration and performing tasks at a consistent pace was moderate. (Tr. 1628.) Dr. Hartman concluded that the results of his examination appeared "consistent with psychiatric deficits that would likely interfere with functioning." His diagnosis was "unspecific depressive disorder" and "[r]ule out personality disorder." *Id.*

## IV.  <u>HEARING TESTIMONY</u>

Plaintiff appeared and offered testimony before the ALJ on September 17, 2017 and, after the remand, on September 10, 2018. He testified at both his hearings that he had lived in the remote woods since 2013, mainly alone, full-time, with no enclosed shelter even in the winter. (Tr. 58, 103.) The bulk of Plaintiff's testimony at the 2017 hearing described his physical problems while trying to work. He described at one point doing sedentary work assembling wedding invitations and found that after one hour he experienced pain in his shoulder and back at an intensity level of seven out of ten. (Tr. 102.) He testified that even a job that involved sitting all day and using only his right hand would be beyond his ability, "[b]ecause of the pain." (Tr. 107.)

As of September 2017, he was living in the forest, moving from areas he considered excessively public to more remote areas, to avoid the "risk of being found, attracting attention." (Tr. 114.) He described encountering a family "looking for a lost, mentally disabled relative," who reported him to the police. (Tr. 114-15.) He had no income and survived by trapping animals, "anything from chipmunks

to deer." (Tr. 115.) When his attorney attempted to question him about being attacked by a pack of coyotes, he declined to respond, but he did mention another occasion when he was attacked by a dog. (Tr. 116.) He used an electrical trimmer to cut his hair, plugging it in at the hospital, or at friends' houses, or in the back of the shopping plaza.  He spent time at the hospital when it was cold or when he needed to charge his phone. He described himself as having "many friends." (Tr. 117.) He was able to drive and sometimes used his sister's car. (Tr. 118, 120.) He regularly managed to attend doctor's appointments, using his MassHealth coverage. (Tr. 119-20.)

The hearing a year later, on September 10, 2018, focused more on Plaintiff's living situation. The ALJ questioned him in detail regarding his method of snaring deer, killing them with his knife, quartering and cooking them. (Tr. 60.) He testified that he used food stamps and could walk for an entire day to reach the Dollar General store where he bought food, transporting his purchases in stages on foot back to the woods. He collected firewood but found that "[m]any times I do not need a fire." (Tr. 65.) He lived in a tent and used a sleeping bag. (Tr. 65-66.) He

chose to live in the woods because "it is better than any of the alternatives I have found." (Tr. 67.) He stated that he was aware of the existence of homeless shelters and had even visited them, but he had not considered living in one. (*Id.*) He described receiving a visit from an old friend who was present when he had a fall and waited while he lay in a river to recover. (Tr. 70-72.) He stated that he walked to the hearing, taking three days, sleeping outside along the way. (Tr. 75.) At the hearing, he was wearing a ripped t-shirt and shorts, despite a temperature under 60, and he had dirty hands. (Tr. 75.) He took no medication for pain. (Tr. 77.) He stated that no one had recommended him for treatment for "psychological issues" and that he did not feel that he needed it. (Tr. 80.) He knew that his mother lived in North Adams, but he never stayed with her and did not want to. (Tr. 82.)

## V.  DISCUSSION

The law in this area is well established.  In reviewing a contested disability determination, a court must weigh whether it is supported by substantial evidence.  The Supreme Court has emphasized that "substantial" means only "'such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The standard is highly deferential to the ALJ's decision. Indeed, the First Circuit has made it clear that "[s]ubstantial-evidence review is more deferential than it might sound to the lay ear"—more than "a scintilla" but less than a preponderance of the evidence. *Purdy v. Berryhill*, 887 F.3d 7, 13 (1st Cir. 2018). If the ALJ's decision has substantial support in the record a court must affirm it, even where the record might justify a different conclusion. *Rodriguez Pagan v. Sec'y of Health and Human Servs.,* 819 F.2d 1, 3 (1st Cir. 1987).

This appeal, as noted, asserts only Plaintiff's mental health difficulties as a basis for a finding of disability. Some elements of the record clearly supported this. The reference in a medical note to Plaintiff's describing an encounter with "balerina's" in the forest (never developed at the hearings), Plaintiff's supposed torture in Israel, his unkempt appearance at times, his tendency to anger, and his choice of a remote and difficult life all raised significant concerns. Dr. Guenther's tentative and

provisional suggestion that Plaintiff's inability to interact with others would be "a major hindrance" to employment certainly had force.

On the other hand, other elements in the record pointed in a different direction. First, literally dozens of references in the medical records referred to Plaintiff's normal mood, affect, and intellectual functioning. Second, Plaintiff himself for the most part took the position that he had no need of mental health support. Certainly, he had never received any such treatment. Third, he possessed marked competencies beyond what are usually found with disability applicants relying on mental health disorders. He could drive a car, shop, cook, attend to personal hygiene, walk for long distances, apply for MassHealth, make use of food stamps, and cope with the challenges of his extremely rigorous living situation. Fourth, the report of Dr. Hartman, finding "psychiatric deficits that would likely interfere with functioning," noted only mild to moderate deficits in competencies needed for employment. (Tr. 1628.) Both he and Dr. Guenther found that Plaintiff could understand, remember, and follow simple directions, which is arguably all that would be required to perform the

"simple, routine, repetitive tasks" defined by the ALJ. Dr. Hartman's report—which found no marked or extreme functional limitations—clearly provides substantial evidence supporting the ALJ's decision that Plaintiff's impairments, whether viewed singly or in combination, failed to rise to the level of a listed impairment.

In summary, the evidence on this record, with regard to the mental health issues raised by Plaintiff, is mixed, and the law is clear that ties must be called in favor of the Commissioner.

Before concluding this discussion, the court will make a final observation on one point of concern. Throughout his testimony and in his interactions with medical personnel, Plaintiff recounts his struggle with physical pain. The law recognizes the obligation of the Commissioner to address subjective reports of pain in determining whether it may render an applicant unable to work. *Nguyen v. Chater*, 172 F.3d 31, 34 (1st Cir. 1999) (stating that where the ALJ credited reports of pain, the ALJ had to consider "the severity of claimant's pain and the extent to which it impeded his ability to work"). The discussion of this topic, both by counsel and by the ALJ, has not been

extensive. Plaintiff testified that even sedentary work assembling wedding invitations became unbearable after an hour due to pain. (Tr. 102, 107.) The ALJ's decision assumes an ability on Plaintiff's part to focus on sedentary work for up to two hours with no break, and with only occasional changes in his physical position, for an entire workday. (Tr. 102, 107.) Nothing in the undersigned opinion would prevent Plaintiff from re-applying for benefits based upon his difficulties with pain, assuming that he can demonstrate a resulting disability during the insured period.

## VI.  <u>CONCLUSION</u>

This case presents a highly unusual fact pattern. The evidence of disability is, in certain respects, strong, and if this court were in the role of factfinder, it might well have approved the application. But this court is not the factfinder, and the record offers "substantial evidence"—as the Supreme Court and the First Circuit have defined it— supporting the ALJ's decision. Under these circumstances, the court's ruling must be for Defendant.

For the foregoing reasons, Plaintiff's motions to reverse the decision of the Commissioner, Dkt. Nos. 17 and

20, are DENIED, and Defendant's motion to affirm, Dkt. No.

24, is hereby ALLOWED.  The clerk will enter judgment for

Defendant. This case may now be closed.

It is so ordered.


/s/ Michael A. Ponsor

MICHAEL A. PONSOR
U.S. DISTRICT JUDGE